# United States Court of Appeals
## For the First Circuit

No. 25-1314

CRYSTAL CZERNO, Individually and as Parent
and Natural Guardian of C.L., a minor,

Plaintiff, Appellee,

v.

GENERAL ELECTRIC COMPANY,

Defendant, Appellant,

MONSANTO COMPANY; SOLUTIA, INC.; PHARMACIA LLC; BAYER, AG;
SABIC INNOVATIVE PLASTICS GLOBAL TECHNOLOGIES LP; SABIC
INNOVATIVE PLASTICS TECHNOLOGIES, INC.; SABIC INNOVATIVE
PLASTICS US LLC; SAUDI BASIC INDUSTRIES CORP., (SABIC);
GE PLASTICS, a/k/a Plastics Technologies, Inc.

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Gelpí, Thompson, and Dunlap,
Circuit Judges.

William M. Jay, with whom Andrew Kim, Christopher J.C.
Herbert, Goodwin Procter LLP, James M. Campbell, Michelle M. Byers,
Christopher B. Parkerson, and Campbell Conroy & O'Neil, P.C., were
on brief, for appellant.

Thomas E. Bosworth, with whom Bosworth DeAngelo, LLC, John B.
Stewart, and John B. Stewart, P.C., were on brief, for appellee.

July 14, 2026

**DUNLAP**, <u>Circuit Judge</u>.  The parties ask us to decide where this case -- which relates to the manufacturing, use, dumping, and remediation of polychlorinated biphenyls ("PCBs") -- will be litigated.  Plaintiff-Appellee Crystal Czerno ("Czerno") urges us to return the case to Massachusetts state court, where she originally filed it, while Defendant-Appellant General Electric Company ("GE") seeks to keep the case in federal court following its removal to the United States District Court for the District of Massachusetts.  Because we conclude that GE has carried its burden to satisfy both the "acting under" and "for or relating to" elements of the federal officer removal statute, 28 U.S.C. § 1442(a)(1), we reverse the district court's decision on removal and remand the case to the district court to decide whether GE has set forth a "colorable federal defense."

## I.

According to Czerno's complaint, her minor son, C.L., developed leukemia after attending school near and residing close to GE's Pittsfield, Massachusetts plant.  For decades, GE manufactured and serviced electrical transformers and capacitors containing PCBs, and produced a dielectric fluid containing PCBs used to insulate electrical devices, at the Pittsfield plant; GE also disposed of PCBs used in the manufacturing process at locations in the surrounding communities -- including at a

location near C.L.'s school.  Czerno alleges that these PCBs caused C.L.'s leukemia.[1]

PCBs are synthetic compounds characterized by chemical stability at high temperatures, high dielectric constants,[2] superior cooling qualities, and non-flammability, which made them an attractive choice for electrical insulation -- and particularly well-suited for military contexts, where the fire and explosion hazards associated with oil-insulated devices are especially acute.  Electrical devices impregnated with PCBs were also markedly more reliable and long-lived than comparable oil capacitors of the mid-to-late 20th century.  They were also one-sixth of the size, one-fifth of the weight, and a quarter of the cost.

That is why, from the early 1930s through the late 1970s, GE manufactured transformers and capacitors containing PCBs. Generally, GE purchased PCBs from the Monsanto Company, blended them into a proprietary mix branded "Pyranol," and infused Pyranol into capacitors, transistors, and other electrical equipment.  The superior chemical and technical properties of these devices also explain why, in the months leading up to World War II, the federal government began ordering Pyranol devices from GE for use in

---

[1] At this stage, we do not opine on the merits of the underlying case and address only the parties' arguments regarding removal.

[2] In the insulation context, a higher dielectric strength allows for a smaller capacitor without loss of utility.

defense work, and, once the war began, continued contracting with GE for Pyranol and electrical equipment containing Pyranol. GE fulfilled these orders from the Pittsfield plant. And to satisfy the government's heightened demands, GE completely dedicated the Pittsfield plant's Capacitor Department to supplying products for the federal government's war efforts during some periods in the 1940s.

Throughout this time, and for decades afterwards, GE allegedly dumped PCBs in the Hill 78 Consolidation area, a six-acre landfill near the Pittsfield plant and adjacent to Allendale Elementary School. In 1950, GE provided the City of Pittsfield with soil from Hill 78 to layer the Allendale Elementary School grounds where, a little over half a century later, Czerno's son attended elementary school.

By the early 1970s, the public became increasingly aware of the possible health and environmental consequences of PCBs, and the government began scrutinizing the use of PCBs. In 1972, Monsanto discontinued sales of PCBs except to those buyers, like GE, with whom it had special indemnity agreements. By the end of that decade, federal legislation and Environmental Protection Agency (EPA) regulations largely prohibited new manufacturing and use of PCBs. See 15 U.S.C. § 2605(e)(2).

In 1980, Congress took the additional step of authorizing the EPA to either compel private parties to remediate

their PCB pollution or otherwise clean up pollution sites directly and then recover costs from the polluters via lawsuits, settlements, or other legal processes. See generally 42 U.S.C. § 9622. This led GE to enter a consent decree with the EPA, Massachusetts, and Connecticut in 2000 under which GE agreed (among other things) to finance and perform remediation of Hill 78, Allendale Elementary, and several other areas in and around Pittsfield.

Notwithstanding these remedial efforts, on August 15, 2023, Czerno sued GE[3] in state superior court in the Commonwealth of Massachusetts on behalf of herself and C.L., alleging that GE's use and disposal of PCBs led to C.L.'s leukemia. Among other claims, she asserts strict liability claims for GE's "defectively designed Pyranol," as well as its "use, disposal, storing, keeping, and/or maintaining of PCBs" (Counts III, XIII); a negligence claim relating to GE's use, dumping, disposal, and remediation of PCBs (Count VI); a fraudulent misrepresentation claim relating to the dangers of PCBs (Count VII); private and public nuisance claims relating to GE's "use, misuse, dumping, failure to remove, failure

---

[3] Czerno also sued Monsanto and several related entities, but because only GE has removed the case to federal court, we address only the theories of liability applicable to GE. As we have recognized, "if a single defendant properly removes under § 1442, the entire action, with all defendants, must be removed to federal court." Gov't of P.R. v. Express Scripts, Inc., 119 F.4th 174, 185 (1st Cir. 2024).

to remediate, disposal, and distribution of PCBs" (Counts IX, X); and claims for improper transportation of hazardous material (Count XV) as well as loss of consortium (Count XVII).

GE timely removed the case to federal court, see 28 U.S.C. § 1446, asserting that the federal officer removal statute, 28 U.S.C. § 1442(a)(1), conferred jurisdiction on the federal courts to hear this case. Czerno moved to remand, arguing that GE had not demonstrated that removal satisfied the elements of § 1442(a)(1). The district court agreed with Czerno and ordered that the case be remanded, but it subsequently stayed the remand order pending this appeal.

We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 1447(d).

**II.**

Congress gave certain parties the "absolute" right to remove a state court suit filed against them to federal court, "regardless of whether the suit could originally have been brought" there. Willingham v. Morgan, 395 U.S. 402, 406 (1969). The right extends to:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or

-7-

> punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1). The basic purpose of this provision is to protect both the federal government and those assisting federal officials from State interference that may reflect local prejudice against federally authorized activities. See Watson v. Philip Morris Cos., 551 U.S. 142, 150 (2007).

When a private entity, like a government contractor, seeks removal under this provision, it must show that (1) it was "acting under" a federal officer's authority, (2) the charged conduct was "for or relating to" that authority, and (3) it can assert a "colorable federal defense" to the suit. Chevron USA Inc. v. Plaquemines Parish, La., 146 S. Ct. 1052, 1057–58 (2026) (first quoting 28 U.S.C. § 1442(a)(1); and then quoting Mesa v. California, 489 U.S. 121, 129 (1989)); Gov't of P.R. v. Express Scripts, Inc., 119 F.4th 174, 185 (1st Cir. 2024). "[T]he removing part[y] bear[s] the burden of showing federal officer jurisdiction as pleaded in their notice of removal," and federal "[c]ourts must credit that party's theory of the case" for removal. Express Scripts, 119 F.4th at 184 (citation modified).

Here, GE offers two theories to support removal under § 1442(a)(1) -- first, that its wartime work for the federal government producing PCB-infused electrical components establishes federal officer jurisdiction, and second, that its work remediating PCB pollution pursuant to the consent decree with the

-8-

EPA also confers federal officer jurisdiction.  The district court rejected both theories and so concluded that GE failed to satisfy § 1442(a)(1).

We review "de novo the district court's jurisdictional determination on removal," and "[w]here the district court resolve[d] disputed issues of fact, we review those factual findings for clear error."  Moore v. Elec. Boat Corp., 25 F.4th 30, 34 (1st Cir. 2022).  Because we find that GE satisfied both the first and second elements of removal under its first theory, we need not and do not address GE's second theory.

## A.    The Federal Officer Removal Framework

GE, as the party seeking to remove to federal court, must first show that it "act[ed] under" a federal officer.  28 U.S.C. § 1442(a)(1); see Express Scripts, 119 F.4th at 185.  If it clears that initial hurdle, GE must then demonstrate that the allegations in the complaint are "for or relating to" its acts under federal authority.  28 U.S.C. § 1442(a)(1); see Express Scripts, 119 F.4th at 186.  We have been clear that these first two elements of § 1442(a)(1) implicate two distinct relationships: the "acting under" element is concerned solely with the relationship between the removing party and the government, see Express Scripts, 119 F.4th at 185-86 ("'[A]cting under' . . . contemplate[s] a relationship where the private party engages in an effort 'to assist, or to help carry out, the duties

-9-

or tasks of the federal superior'" (quoting Moore, 25 F.4th at 34 n.3) (alterations and emphases in original)), while the "for or relating to" element addresses the relationship between "the allegations in the complaint" and the work done under a federal officer, see Rhode Island v. Shell Oil Prods. Co., 35 F.4th 44, 53 n.6 (1st Cir. 2022) ("Shell Oil II") (noting that the "relating to" element requires "a 'nexus' between 'the allegations in the complaint and conduct undertaken at the behest of a federal officer'" (quoting Moore, 25 F.4th at 34 & n.2)).

The Supreme Court has recently reiterated that these two elements are distinct and require different analyses. In Plaquemines Parish, the Supreme Court rejected an attempt to intermingle these two elements of the federal officer removal statute as being "not consistent with the statutory text." 146 S. Ct. at 1063. The respondent in Plaquemines Parish argued, much as Czerno does here, that "the removal statute requires that the defendant was 'acting under' a federal officer in taking the specific actions challenged in the suit." Id. at 1062. But that analysis is wrong, as it would "impermissibly conflate[] the distinct . . . elements of the" test "in a way that makes part of it redundant." Id. at 1063 (citation modified).

With this framework in mind, we turn to GE's first theory of removal.

**B.    GE's "Government Contractor" Theory of Removal**

The district court concluded that GE's role as a government contractor was insufficient to establish grounds to remove Czerno's complaint under § 1442(a)(1). In GE's view, the district court erred both by characterizing the products provided to the government as off-the-shelf products and by emphasizing "strict control" as the requisite relationship between the federal government and government contractors. We agree with GE. Though the "acting under" standard is not so lax that anyone who sells goods at arm's-length to the government qualifies for removal, we hold that GE's relationship with the armed forces and its manufacture of specialized PCB-containing products for use in specific military contexts, at the request of the military, is sufficient to establish the requisite relationship for removal. We also conclude that Czerno asserts claims that readily relate to GE's work under the federal government.

**1.    "Acting Under"**

"'The words "acting under" are broad,' and, like the rest of [§ 1442(a)], 'must be "liberally construed."'" Express Scripts, 119 F.4th at 185 (quoting Watson, 551 U.S. at 147). The relationship envisioned by the statute is characterized by the private party's "effort to assist, or to help carry out, the duties" of the government, and "typically involves 'subjection, guidance, or control.'" Watson, 551 U.S. at 151-52 (emphases in

-11-

original) (quoting Webster's New International Dictionary 2765 (2d ed. 1953)); see Moore, 25 F.4th at 34 n.3. Although regulatory compliance alone is insufficient to satisfy the "acting under" element, the element is generally satisfied when a private entity helps the "[g]overnment to produce an item that it needs" or helps federal "officers fulfill other basic governmental tasks." Watson, 551 U.S. at 153; see Express Scripts, 119 F.4th at 185-86. Other circuits have held, and we agree, that mere government agreements to purchase "off-the-shelf" products from private entities do not suffice to establish the requisite relationship. Express Scripts, 119 F.4th at 193; see, e.g., Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc., 25 F.4th 1238, 1253 (10th Cir. 2022); Washington v. Monsanto Co., 738 Fed. App'x 554, 555 (9th Cir. 2018). But where private contractors manufacture goods for the government, at the government's request, and to satisfy a governmental need, private contractors may be found to have acted under a federal officer. See Moore, 25 F.4th at 34 n.3.

"[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied" in the government contractor context, Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 255 (4th Cir. 2017), and military contractors are the "archetypal case" of entities "acting under" the United States, Williams v. Lockheed Martin Corp., 990 F.3d 852, 859 (5th Cir. 2021) (quoting Papp v. Fore-Kast

-12-

Sales Co., 842 F.3d 805, 813 (3d Cir. 2016)); see Moore, 25 F.4th at 34 n.3 (collecting cases); see, e.g., Genereux v. Am. Beryllia Corp., 577 F.3d 350, 357 n.9 (1st Cir. 2009) (recognizing federal officer removal based on defendant's "assertion that it was a 'person acting under'" a federal officer "because the beryllium-containing products it supplied to Raytheon were used in manufacturing 'military hardware'"); Isaacson v. Dow Chem. Co., 517 F.3d 129, 137 (2d Cir. 2008) (holding that the "acting under" element was satisfied where the defendants contracted with the government "to provide a product that the [g]overnment was using during war -- a product that, in the absence of Defendants, the [g]overnment would have had to produce itself").

In this case, GE acted under a federal officer by providing the government with "an item that it need[ed]" and "perform[ing] a job . . . the [g]overnment itself would have had to perform," Watson, 551 U.S. at 153-54; see Doe v. BJC Health Sys., 89 F.4th 1037, 1045 (8th Cir. 2023), by providing the military with components for military hardware. Specifically, GE acted under federal officers when it produced PCB-infused electrical devices, like transformers and capacitors, for the military.

Throughout the 1940s, the government placed substantial "priority orders" for electrical system components containing PCBs for use in defense work, requiring GE to meet government timelines

-13-

and avoid delivery delays -- and leading GE to "adapt[]" its facilities to meet the demands.  When viewed in the wartime context, the government's demand for PCB-infused products is not at all surprising; Pyranol offered important qualities, such as fire resistance, that were crucial for the federal government's military considerations.  To that end, the federal government enlisted GE to fulfil "major war supply contracts" for PCB-infused transformers and capacitors for immediate use and integration into war-related infrastructure and machinery.  In turn, and to meet the government's substantial demands, GE -- at some periods during the war -- had to dedicate the entirety of its Pittsfield plant's production and output towards fulfilling the government's needs. Further, to meet these government demands, GE departed from its normal operations and adapted its facilities to manufacture the capacitors ordered by the government.

Among other products, the government ordered from GE "pyranol type" transformers and small capacitors for use in "gun, tank and equipment controls," and "aircraft service, motors, generators, and radio interference suppression," as well as "anti-aircraft shell and torpedo detonators" for the "Army and Navy."  Similarly, the government ordered Pyranol-infused "Large Power Factor Capacitors" from GE for large radar equipment.  The government required capacitors "rang[ing] in size from a few ounces to 100 pounds or more," for various "applications" that were

"developing almost daily," and so GE customized the capacitors to the government's needs, harnessing "a wide variety" of "manufacturing processes and types of facilities" to build the different capacitors. In producing these items, GE "provid[ed] the [g]overnment with . . . product[s]" -- components for weaponry and defense systems -- "that [the government] used to help conduct a war." Watson, 551 U.S. at 154.

The military's voracious appetite for GE's Pyranol products during World War II fostered and cemented a close relationship between the government and GE that persisted for decades after the war. Communications between GE and Monsanto from 1941 indicate that "it [was] almost impossible" for GE to keep a list of orders from the government "up to date" because the volume of the government's orders was so substantial. One naval station alone, for example, placed new priority orders with GE for Pyranol transformers "almost daily." The government's reliance on GE was so acute that it even approved a Necessity Certificate for Monsanto, in part because Monsanto's delay in providing chemicals to GE was slowing down GE's ability to furnish the government with Pyranol-insulated equipment.[4] Directed by the government to meet

_____

[4] The district court noted that the Certificates of Necessity GE sought from the government concern GE's receipt of tax incentives for producing PCBs. But this context does not alter our analysis. GE's applications for Certificates of Necessity demonstrate GE dedicated a substantial volume of its production to

-15-

its military needs, GE was enmeshed in "do[ing] the business of the federal government and not merely its own."  BJC Health Sys., 89 F.4th at 1043.

After the war, GE's continued provision of PCBs remained essential to the government's carrying out of its duties and tasks. In a 1974 letter to GE, a Navy official noted that "[t]he Navy Department, and other agencies of the Department of Defense as well, have a substantial number of transformers and electrical devices in which the use of askarel rather than ordinary transformer oil is essential."[5]  The Navy acknowledged that "[m]any of" the transformers and electrical devices that the Navy, as well as other agencies of the Department of Defense, had purchased were "products of the General Electric Company," containing Pyranol, and the Navy "of course . . . look[ed] to General Electric for the supplies necessary to keep them operational" because it was "essential" that PCBs "be procured for use by [g]overnment personnel in servicing [electrical] devices."

---

providing the government with particularized components for military equipment.

[5] Czerno urges that this letter did not require GE to provide PCBs to the government and instead "merely reflects the Navy's view that askarels, in general" -- rather than PCBs in particular -- "were essential for operation of some of its equipment."  As discussed in more detail below, the "acting under" standard is not so exacting that it requires the defendant to have been "'acting under' a federal officer in taking the specific actions challenged in the suit."  Plaquemines Parish, 146 S. Ct. at 1062.

-16-

On the record before us, it does not appear that GE was providing the government with a "widely available commercial product[] or service[]," Cnty. of San Mateo v. Chevron Corp., 32 F.4th 733, 757 (9th Cir. 2022), via a traditional commercial relationship; rather, GE produced specialized products for the government through an "unusually close" relationship, wherein GE manufactured goods at the "direction" of the military in order to "assist, or to help carry out," the government's "duties" by developing equipment for war, Express Scripts, 119 F.4th at 185 (third and fourth quotation), 193 (second quotation); see Watson, 551 U.S. at 152-53. Several exhibits in the record demonstrate a high level of detail and specification in the government's demands from GE. For example, communications between GE and the Navy from November of 1972 show that the Navy requested a quote from GE based on its technical needs, and GE, in turn, furnished specific products it deemed to be "satisfactory" in fulfilling those needs. In the relevant letters, GE recommended the Navy order "three (3) 75 KVA pyranol type single phase, 60 cycle, high voltage, 2400/4160 Y, high voltage tap, two 5 percent rated KVA below normal, low voltage 120/240" transformers to fit the government's intended use of operating motors at a certain power factor, stating that the transformers "should be satisfactory" assuming the motors would not be started simultaneously; the Navy then requested requisition of the transformers. In other words, GE responded to the

-17-

government's unique demands by furnishing it with specialized products and the government relied on GE's technical expertise when contracting with it to provide these products.

By developing and selling essential Pyranol fluids and Pyranol-infused devices to the government, both during and after the war, GE "provid[ed] the [g]overnment with a product that it used" to "fulfill . . . basic governmental tasks," and was engaged in an "effort to assist" the Navy with maintaining its technological infrastructure. Watson, 551 U.S. at 152-54. The nature and specificity of the defense orders, the specialized nature of the items provided to the government, and GE's relationship with the government -- including the dedication of GE's facilities to the fulfillment of government contracts -- lead us to conclude that GE is squarely in line with other government contractors who have successfully sought removal by virtue of their "product[s] manufactured for the government" at the direction of the government. Moore, 25 F.4th at 34 n.3; see Genereux, 577 F.3d at 357 n.9; Sawyer, 860 F.3d at 255 (holding that a federal contractor that assembled boilers for Naval vessels was "acting under" a federal officer's authority). We think it more than "at least arguabl[e]" that "in the absence of a contract with a private firm, the [g]overnment itself would have" been responsible for producing and servicing these components for weapons. Watson, 551

U.S. at 154; Express Scripts, 119 F.4th at 185-86. That is enough to conclude GE acted under a federal officer.

The district court's contrary conclusion, and Czerno's insistence that the "acting under" requirement is not satisfied because GE's government contracts did not mandate GE's improper disposal of PCBs, reflect an overreading of the "acting under" requirement. The district court reasoned that the federal government must exercise "tight control" over the work of the private contractor for that contractor to "act under" federal officers, citing an unpublished district court opinion, Progin v. UMass Mem'l Health Care, Inc., 2023 WL 4535129, at *4 (D. Mass. July 13, 2023). But the Supreme Court has not adopted such a standard, nor have we. Indeed, to do so would run against our precedent that the provision "must be liberally construed . . . to ensure a federal forum in any case where a . . . private actor[] acting on [a federal] official's behalf may raise a defense arising out of his official duties." Express Scripts, 119 F.4th at 185 (citation modified). We have not before adopted, and do not today adopt, "a narrow, grudging interpretation of § 1442(a)(1)." Id. (quoting Arizona v. Manypenny, 451 U.S. 232, 242 (1981)).

Specifically, in reaching its conclusion, the district court overread Watson's citation to Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387 (5th Cir. 1998). In Watson, the Supreme Court descriptively observed that many lower courts -- including

-19-

the Fifth Circuit in Winters -- had "held that [g]overnment contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the [g]overnment is an unusually close one involving detailed regulation, monitoring, or supervision." 551 U.S. at 153.[6] In Winters, "the defendants were compelled to deliver Agent Orange to the government under threat of criminal sanctions," and the specific formulation of chemicals constituting Agent Orange were "never manufactured or registered . . . for domestic use either prior to or after" the defendants "ma[de] 'Agent Orange' for the [g]overnment." 149 F.3d at 398-99 (second citation modified). We do not read Winters as delimiting the parameters of the "acting under" element. Indeed, as we have noted, the Supreme Court ultimately observed in Watson that the answer to the "acting under" question for contractors turns on the fact that contractors "help[] the [g]overnment to produce an item that it needs" and thereby "help[] officers fulfill . . . basic governmental tasks." 551 U.S. at 153. The Supreme Court's takeaway from Winters -- and ours too -- is that when a firm "provid[es] the [g]overnment with a product that it use[s] to help conduct a war" and "perform[s] a

---

[6] Watson v. Philip Morris Cos. did not involve claims against a contractor, but rather claims against an entity "subjected to intense regulation." 551 U.S. 142, 153 (2007). In Watson, therefore, the Supreme Court only discussed government contractors in response to the regulated entity's effort to compare itself to government contractors. Id. at 153-54.

job that, in the absence of a contract with a private firm, the [g]overnment itself would have had to perform," the firm "act[s] under" a federal officer. Id. at 154.[7]

We recognize that there exists a spectrum of government contracts: on one end of the spectrum -- the non-removable end -- are traditional commercial agreements to purchase off-the-shelf goods, while on the other end are contracts where, as in Winters, the government exhibits total dominion and control over the private entity's production of a product. Our decision establishes no bright line, and we hold only that the nature of the PCB-infused devices that GE produced for the government, at the government's demand and with GE's close cooperation and dedication of its facilities to government needs, places this case on the removable side of the spectrum.[8]

_____

[7] We further note that the "strict control" language in Winters v. Diamond Shamrock Chem. Co. was employed in the Fifth Circuit's analysis of the "nexus" element, rather than the "acting under" element, of the federal officer removal statute. 149 F.3d 387, 399 (5th Cir. 1998). In light of Chevron USA Inc. v. Plaquemines Parish, La., we doubt that this limitation can appropriately be employed to determine whether a contractor is acting under a federal officer. 146 S. Ct. 1052, 1062-63 (2026). In Plaquemines Parish, the Supreme Court warned against conflating the two requirements. Id. We need not opine on whether the "strict control" language is useful even as to the nexus element, beyond noting that Winters (and, for that matter, Watson) pre-dated Congress's loosening of the nexus standard. See Express Scripts, 119 F.4th at 186 (describing the amendment of § 1442(a)(1) in 2011). We discuss the applicable nexus standard below.
[8] GE's contracts with the government distinguish this case from cases where courts have rejected efforts by Monsanto to remove similar complaints to federal court (many of which Czerno relies

-21-

Finally, we are unpersuaded by Czerno's arguments that our decision in Shell Oil prohibits GE from removing this case. There, dealing with claims against oil companies for fossil fuel-related environmental damages, we declined to permit removal because there was "simply no nexus between anything for which Rhode Island seeks damages" -- specifically, selling oil and gas products that were damaging to the environment and engaging in a misinformation campaign about their products' impact on the environment -- "and anything the oil companies allegedly did at the behest of a federal officer." Rhode Island v. Shell Oil Prods. Co., 979 F.3d 50, 60 (1st Cir. 2020), cert. granted, judgment vacated on other grounds, 141 S. Ct. 2666 (2021) ("Shell Oil I") (emphasis added); Shell Oil II, 35 F.4th at 53 n.6 (expressly "adher[ing] to" the § 1442(a)(1) reasoning in Shell Oil I). That analysis concerned the "relating to" element -- not, as Czerno claims, the "acting under" element. Shell Oil I, 979 F.3d at 60; see Moore, 25 F.4th at 34 n.2 (noting that Shell Oil I "described the 'relating to' requirement as a 'nexus' between 'the allegations in the complaint and conduct undertaken at the behest of a federal officer'" (quoting Shell Oil I, 979 F.3d at 59)). Shell Oil I does not suggest that, for the "acting under" element to be

---

on for her argument that removal is improper in toxic pollution cases). Monsanto did not have contracts with the federal government, unlike GE here. See, e.g., Washington v. Monsanto Co., 274 F. Supp. 3d 1125, 1129-30 (W.D. Wash. 2017).

satisfied, the government must have specifically directed GE to undertake the activities Czerno alleges caused her and her son's injuries. And, to the extent Czerno argues that it does, we reiterate that such a reading would be inconsistent with the statutory text of § 1442(a)(1) and is foreclosed by Plaquemines Parish. See 146 S. Ct. at 1063 (explaining that such an interpretation "would leave the 'relating to' requirement with little, if any, independent function" apart from the "acting under" element).

## 2. "For or Relating To"

Having demonstrated that it acted under federal officers' authority in developing PCB-infused electrical products, GE must next show that the allegations in Czerno's complaint are based on conduct "for or relating to" GE's work under federal officers.[9] 28 U.S.C. § 1442(a)(1). The "for or relating to" element, which we have referred to as the "nexus" element, Moore, 25 F.4th at 34 n.2, "sweeps broadly," Plaquemines Parish, 146

---

[9] The parties disagree over whether the district court reached this issue. GE argues that the court reached and addressed both the "acting under" and "for or relating to" elements, while Czerno argues that the court reached only the former. While the district court did not delineate its discussion with respect to each requirement, it devoted two paragraphs to analyzing the nature of the alleged injuries and their relationship (in other words, their nexus) to GE's work for the federal government. So, GE is correct: the district court concluded that GE failed to show both that "it acted under a federal officer" and that its "conduct . . . closely related to the government's implementation of federal law." We thus address the parties' nexus arguments.

S. Ct. at 1060, particularly following the amendment of the federal officer removal statute in 2011. That year, Congress broadened § 1442(a)(1) to allow removal of claims not just "for" acts under color of federal office, but also for claims "relating to" such acts. 28 U.S.C. § 1442(a)(1) (emphasis added); see Express Scripts, 119 F.4th at 186; Moore, 25 F.4th at 35 n.4; Removal Clarification Act of 2011, Pub. L. No. 112-51, §2(b)(1), 125 Stat. 545 (2011). The post-amendment language of the statute does not support a causation requirement, Moore, 25 F.4th at 34 n.2, 35, and the broader "for or relating to" nexus allows defendants sued for conduct that merely has some "association with or connection with" their acts under a federal officer to remove the case to federal court, id. at 35 n.4; see Plaquemines Parish, 146 S. Ct. at 1060 (stating that the phrase "relating to" means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with" (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992))); Latiolais v. Huntington Ingalls, Inc., 951 F.3d 286, 292 (5th Cir. 2020). And for purposes of removal, "[a]ny single claim is independently sufficient to satisfy the 'for or relating to' requirement." Moore, 25 F.4th at 35.

Czerno's principal argument on appeal is that there is no causal nexus between the allegations in her complaint and GE's work for the government because her claim relates to the disposal

-24-

of PCBs and the government never authorized GE to improperly dispose of PCBs. This argument misses the mark for two reasons.

First, as discussed, the 2011 amendment to the federal officer removal statute expanded the right of removal, so GE need not prove that the work it did for the federal government directly caused the injuries Czerno alleges -- it need only show that the allegations "stand in some relation" to, or are in "association with or connection with," GE's work for the government. Plaquemines Parish, 146 S. Ct. at 1060 (quoting Morales, 504 U.S. at 383); see Moore, 25 F.4th at 34.[10] Accordingly, even accepting that the government only directed GE to manufacture devices containing PCBs and said nothing regarding disposal of PCBs from the manufacturing process, removal is appropriate. Improper disposal itself "relates to" GE's use and manufacture of products containing PCBs. See Plaquemines Parish, 146 S. Ct. at 1060-62.

Second, Czerno severely understates the scope of her complaint. Her complaint expressly seeks recovery from GE for its use of PCB materials and manufacture of products containing

---

[10] The district court missed the import of the amendment, relying almost exclusively on pre-2011 decisions in its discussion of the nexus requirement. The only more-recent decision the district cited in this section is Attorney General v. Dow Chem. Co., 2024 WL 1740087 (D.N.J. Apr. 23, 2024) -- an unpublished, out-of-circuit decision, which similarly seemed to miss the import of the 2011 amendment and referred to the nexus element as a "causation" requirement. Id. at 9. Many of the cases Czerno relies on for her argument that removal is improper in toxic pollution cases suffer from the same flaw.

PCBs -- not just for the improper disposal of PCBs. We have little difficulty concluding that Czerno's allegations directly relate to GE's production and use of Pyranol for the government. Czerno's allegations encompass GE's manufacture of electrical equipment "[b]etween 1932 and 1977," a timeframe which includes GE's wartime manufacturing for the government. Moreover, her complaint relates not just to GE's disposal and dumping, but also GE's "use" and "manufacture" of Pyranol and Pyranol products. A few examples are illustrative:

- In Count III of her complaint, Czerno demands recovery for GE's "defective design" of Pyranol, as an "unreasonably dangerous" material.

- In Count VI, Czerno seeks recovery for GE's "use [of] PCBs in the manufacturing process despite knowing that PCBs possessed" toxic qualities.

- In Counts IX and X, Czerno demands recovery for GE's "ongoing use, misuse . . . and distribution of PCBs and Pyranol," as well as its storage and disposal of the same.

- In Count XIII, Czerno seeks damages for GE's "use, disposal . . . and . . . maintaining" of "inherently" ultrahazardous PCBs.

The district court erred by reading Czerno's complaint "as [a] whole" and inferring the gravamen of her complaint to be that GE

improperly dumped PCBs.  It instead should have parsed out whether "[a]ny single claim is independently sufficient to satisfy" the "relating to" element.  Moore, 25 F.4th at 35; Wright & Miller's Federal Practice & Procedure § 3726 (4th ed. 2026) ("Section 1442(a)(1) authorizes removal of the entire action even if only one of the controversies it raises involves a federal officer or agency.").  Given the allegations in the complaint, several of Czerno's claims go far beyond improper disposal, and instead focus directly on GE's use of PCBs.

Because the federal government expressly contracted with GE to use and manufacture Pyranol and Pyranol-infused devices, these claims are more than enough to satisfy the "relating to" nexus element.  This is not a close case where the relationship between the allegations in the complaint and the defendant's acts under a federal officer are "tenuous, remote, or peripheral." Plaquemines Parish, 146 S. Ct. at 1061 (quoting Rutledge v. Pharm. Care Mgmt. Ass'n, 592 U.S. 80, 94 (2020) (Thomas, J., concurring)). Czerno's claims seeking recovery for GE's design, manufacture, and use of Pyranol and Pyranol-infused devices are plainly "for or relating to" GE's production of Pyranol and Pyranol-infused devices under federal officers.[11]   28 U.S.C. § 1442(a)(1).

_____

[11] Because Czerno continues to pursue these claims and does not disclaim any of these allegations, she cannot hide from these allegations simply by arguing that the gravamen of her claims relates to disposal.  As we have clearly stated, to defeat removal,

-27-

Accordingly, GE has satisfied the "for or relating to" nexus element of the statute.

## C.   Colorable Federal Defense

The remaining element of § 1422(a)(1) removal is whether GE has sufficiently established that it possesses a "colorable federal defense to the suit." See Moore, 25 F.4th at 34 (quoting Shell Oil I, 979 F.3d at 59). The district court did not reach this issue, though the parties, on appeal, have argued it. Though we may, at our discretion, decide this matter too, see Moore, 25 F.4th at 36, we decline to do so. We instead remand this matter to the district court to consider it in the first instance with the guidance that "a federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" Id. at 37 (quoting Latiolais, 951 F.3d at 297).

## III.

We **reverse** the district court's decision and **remand** the case to the district court to decide whether GE has presented a colorable federal defense.

---

a plaintiff must expressly renounce the claims that would otherwise give rise to federal officer removal jurisdiction. Express Scripts, 119 F.4th at 187; see Maine v. 3M Co., 159 F.4th 129, 139 (1st Cir. 2025). Czerno did no such thing. We cannot simply overlook the allegations of the complaint.